UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X

Anna Gelman, Yiraldy Rodriguez, Carl Adams, Michael Valdes, Maria Ayala, Boris Shulkin, Barbara S. Colton, and La Red de Pueblos Transnacionales,

Civ. 1:25-cv-04948--ALC

Plaintiffs,

v.

**SUPPLEMENTAL COMPLAINT**

Barbara C. Guinn, as Commissioner of the New York State Office of Temporary and Disability Assistance,

Defendant.
------------------------------------------------------X

## PRELIMINARY STATEMENT

1. This case seeks to remedy a serious and ongoing injustice against some of the poorest people in New York. Defendant provides recipients of Supplemental Nutrition Assistance Program (SNAP) benefits, also known as food stamps, through a system that is vulnerable to an electronic form of theft known as skimming, even though there is a readily available technology which would greatly reduce the vulnerability of SNAP benefits to this form of theft. In fiscal years 2023 and 2024, there were approximately 85,000 known SNAP skimming thefts in New York State.

2. Plaintiffs Anna Gelman, Yiraldy Rodriguez, Carl Adams, Michael Valdes, Maria Ayala, Boris Shulkin, and Barbara S. Colton are SNAP participants and victims of skimming. Plaintiff La Red de Pueblos Transnacionales (hereinafter "La Red") is a community-based organization in the South Bronx, many of whose members are SNAP recipients who have been victims of skimming.

3. Skimming occurs when perpetrators use hidden card-reading devices at point-of-sale terminals to capture data stored on the magnetic strips of credit or debit cards, including the

Electronic Benefits Transfer (EBT) cards used to make purchases using SNAP benefits. The data stored on the magnetic strips includes all of the data needed to complete a transaction on the cardholder's account, including the cardholder's name, account number, card expiration date, and personal identification number (PIN). The thieves can then use the stolen data to create a counterfeit card and steal from the victim's account.

4. In response to the growing threat of skimming, the financial industry has moved away from reliance on magnetic strips on debit and credit cards to using chip-enabled and "tap-to-pay" cards. These cards can store more information, allowing for the data stored on them to be encrypted, which secures them against skimming devices.

5. Despite this shift to superior technologies in the larger debit and credit card industry, New York SNAP participants remain susceptible to skimming because EBT cards, which are issued in New York City by the New York State Office of Temporary and Disability Assistance (OTDA) and its agent in New York City, the New York City Department of Social Services (DSS), continue to rely entirely on the use of a magnetic strip.

6. Despite these technological deficiencies and an epidemic of EBT skimming, beneficiaries whose SNAP benefits are skimmed cannot get them replaced. A program from October 2022 through December 2024 allowed limited replacement of skimmed benefits, but that program has ended, leaving victims of skimming without recourse and often unable to find food for their households.

7. Ms. Gelman, Ms. Rodriguez, Mr. Adams, Mr. Valdes, Ms. Ayala, Mr. Shulkin, and Ms. Colton all experienced hardship because they lost benefits from skimming. Because they are forced to continue to use vulnerable magnetic card technology, they are at constant risk of having their SNAP benefits stolen again.

8. Because skimming is a constant problem for Plaintiff La Red's members, La Red has been forced to divert staff resources to helping members preserve and reclaim their benefits. As long as Defendant continues to issue EBT cards with vulnerable magnetic-strip technology, La Red will continue to expend its limited resources supporting members who have been victims of skimming.

**JURISDICTION AND VENUE**

9. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331, for claims arising under the Food and Nutrition Act, 7 U.S.C. § 2011 *et seq*. and 42 U.S.C. § 1983. This Court has supplemental jurisdiction over state law claims under 28 U.S.C. § 1367.

10. Venue is proper in this court pursuant to 28 U.S.C. § 1391 because the Southern District of New York is the where the events giving rise to the Plaintiffs' claims have occurred.

11. Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202 and by Rule 57 of the Federal Rules of Civil Procedure. Injunctive relief is authorized by Rule 65 of the Federal Rules of Civil Procedure and by the Court's equitable authority.

**JURY DEMAND**

12. Plaintiffs hereby demand a trial by jury on all issues so triable.

**PARTIES**

**Plaintiffs**

13. Plaintiff Anna Gelman is a SNAP recipient who lives in Brooklyn, New York.

14. Plaintiff Yiraldy Rodriguez is a SNAP recipient who lives in the Bronx, New York.

15. Plaintiff Carl Adams is a SNAP recipient who lives in the Bronx, New York.

16. Plaintiff Michael Valdes is a SNAP recipient who lives in the Bronx, New York.

17. Plaintiff Maria Ayala is a SNAP recipient who lives in the Bronx, New York.

18. Plaintiff Boris Shulkin is a SNAP recipient who lives in Brooklyn, New York.

19. Plaintiff Barbara S. Colton is a SNAP recipient who lives in New York, New York.

20. Plaintiff La Red is a community-based organization in the South Bronx focused on identifying, amplifying, and meeting the needs of all immigrants, with a particular emphasis on Mexican indigenous communities and Mexicans from rural areas. As part of this work, the organization provides information about public benefits and enrollment services for eligible members. Many of the people with whom La Red works have been victims of skimming.

**Defendant**

21. Defendant Barbara C. Guinn is Commissioner of OTDA, the agency in charge of administering the SNAP program in New York State. She is sued in her official capacity.

## STATUTORY AND REGULATORY CONTEXT

### History & Overview of the SNAP Program

22. Congress established the Food Stamp program in 1964. Food Stamp Act of 1964, Pub. L. No. 88-525, 78 Stat. 703 (codified as amended at 7 U.S.C. § 2011 et seq.). The purpose of the program is to "safeguard the health and well-being of the Nation's population by raising levels of nutrition among low-income households," and to "permit low-income households to obtain a more nutritious diet through normal channels of trade by increasing food purchasing power for all eligible households who apply for participation." 7 U.S.C. § 2011; 7 C.F.R. § 271.1.

23. In 2008, the Food Stamp Program was renamed the Supplemental Nutrition Assistance Program (SNAP), and the federal Food Stamp Act was renamed the Food and Nutrition Act of 2008 ("SNAP Act"). Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, §§ 4001–02, 122 Stat. 1651, 1853 (2008).

24. For the period from October 1, 2024, through September 30, 2025, the net monthly income limit for SNAP eligibility is set at $1,632 for a single adult and $2,798 per month for a family

of three. *SNAP Eligibility*, U.S. Dep't of Agric., https://www.fns.usda.gov/snap/recipient/eligibility (last accessed June 10, 2025).

25. The maximum SNAP benefit is adjusted annually. 7 C.F.R. § 273.9(a)(3). For the period from October 1, 2024, through September 30, 2025, the maximum benefit is $292 per month for one person and $768 per month for a family of three. Policy Memo, U.S. Dep't of Agric., SNAP-Fiscal Year 2025 Cost-of-Living-Adjustments (Aug. 2, 2024), https://www.fns.usda.gov/snap/fy-2025-cola (last accessed June 10, 2025).

26. Federal law provides that SNAP participants are legally entitled to SNAP benefits if they are eligible and apply for assistance. *See* 7 U.S.C. § 2014(a) ("Assistance under this program *shall be furnished* to all eligible households who make application for such participation.") (emphasis added).

27. Although SNAP is a federally funded program, State agencies are responsible for administering the SNAP program within each State consistent with federal law. *See* 7 U.S.C. § 2020(a)(1); 7 C.F.R. § 271.4.

28. In New York State, the State agency responsible for administering SNAP benefits is OTDA.

29. OTDA issues SNAP program participants benefits once per month, with the date of issuance correlating to the last digit of a recipient's public assistance case number. *See* Form EBT-52A (EBT Pick-Up Schedule), at https://otda.ny.gov/workingfamilies/ebt/nyc-issuance-schedule.pdf (last accessed June 10, 2025).

30. Federal law requires that State agencies, including New York's OTDA, "provide timely, accurate, and fair service to applicants for, and participants in, the supplemental nutrition assistance program[.]" 7 U.S.C. § 2020(e)(2)(B)(i).

31. New York State regulations also establish SNAP recipients' right to "timely and accurate issuance of benefits." 18 N.Y. Comp. Codes R. & Regs. § 387.2(p).

**Electronic Benefits Transfer**

32. When the food stamp program began, participants received their benefits as paper coupons. In the late 1990s, Congress amended the Food Stamp Act to require State agencies to deliver benefits via an EBT system compliant with federally established standards. 7 U.S.C. § 2016(h); see also Pub. L. No. 104-193, § 825, 110 Stat. 2105, 2324-26 (1996). Under this system, participants are issued an EBT card instead of paper coupons to access their benefits. New York City had fully implemented EBT by December 1999, and by mid-2004, all 50 states, the District of Columbia, the Virgin Islands, and Guam had transitioned to EBT.[1]

33. State agencies administering the SNAP program are required to "take into account evolving technology and comparable industry standards" regarding "privacy, ease of use, and access to and service in retail food stores" following the switch from paper coupons to EBT. 7 U.S.C. § 2016(h)(2)(A), as amended by Pub. L. 101-624 § 1729, 104 Stat. 3359, 3789-90 (1990). Congress also commanded agencies to implement "other measures to protect against fraud and abuse[.]" 7 U.S.C. § 2016(h)(2)(C)(i).

[1] Administrative Directive 00 ADM-8, OTDA, *Electronic Benefit Transfer (EBT)* (Oct. 7, 2000), https://otda.ny.gov/policy/directives/2000/ADM/00adm8.pdf (last accessed June 10, 2025); *A Short History of SNAP*, U.S. Department of Agriculture – Food and Nutrition Service (USDA–FNS), https://www.fns.usda.gov/snap/history (last accessed June 10, 2025).

## FACTUAL ALLEGATIONS REGARDING THE SNAP PROGRAM

### Use of EBT Cards to Purchase Food with SNAP in New York State

34. SNAP program participants in New York use an EBT card issued by OTDA and its agents to access SNAP benefits for the purchase of food from authorized retailers. The EBT benefits are "issued from and stored in a central databank" and the SNAP participants can receive the benefits only by "electronically access[ing them]…at the point of sale." 7 U.S.C. § 2016(h)(11).

35. SNAP program participants can check the benefits available in their accounts in several ways: by (a) checking their local welfare agency account online or through a mobile application (in New York City this is called "AccessHRA"); (b) calling the number on the back of their EBT cards; (c) logging into a website known as ebtEDGE, https://www.ebtedge.com (last accessed June 10, 2025); and (d) in New York City, calling DSS's OneNumber.

36. SNAP participants thus have access to a government-administered SNAP account with a certain balance at any given moment available for use with a merchant. However, the participant does not have physical control of the benefits themselves, as they once did when food stamp coupons were delivered to them in the mail. Now, all benefits remain in the state government-controlled account, which remains vulnerable to skimming and other forms of theft.

### "Skimming" and the Federal and State Agency Response

37. As noted above, skimming occurs when thieves place a skimming device on an ATM[2] or point-of-sale device. These devices are extremely hard to detect—for both the customer and the owner/lessor of the ATM or point-of-sale device—and have become increasingly sophisticated. Typically, these devices take the form of physical overlay devices with Bluetooth

[2] Participants cannot withdraw SNAP benefits from an ATM. However, some SNAP recipients also receive Family Assistance or Safety Net Assistance cash benefits through same EBT card. Recipients can withdraw cash benefits from ATMs.

technology and are designed to look exactly like the underlying device. In retail stores, thieves often install a false, Bluetooth-enabled cover, designed to look exactly like a debit card reader, over a real debit card reader. The FBI provides the following graphic to explain the difficulties of identifying an ATM with a skimming device (available at https://www.fbi.gov/image-repository/atm-skimming-graphic.jpg/view) (last accessed June 11, 2025):



38. Thieves use the data to create a duplicate version of a card which then enables remote access to the compromised account. *See* General Information System Message from Valerie Figueroa, Deputy Comm'r Emp. and Income Support Programs, OTDA, Skimming & Phishing: EBT Scams Currently Impacting Recipient Households, 2 (Oct. 27, 2022), https://otda.ny.gov/policy/gis/2022/22DC097.pdf (last accessed June 10, 2025).

39. Because there is no outward indication that data on the EBT card has been captured, and since skimming devices allow legitimate EBT transactions to proceed unimpeded, targeted retailers and victims are typically unaware that theft has occurred until the SNAP recipient next attempts a purchase or reviews their balance.

40. In federal fiscal years 2023, 2024, and 2025, while the program for partial replacement of skimmed SNAP benefits was in effect, the United States Department of Agriculture (USDA) approved a total of 691,970 claims for stolen SNAP benefits and replaced $322,599,871 in benefits.[3] New York comprised 110,179 of the approved claims, and $50,686,854 of the benefits paid out—16 percent of the nationwide totals.[4]

41. Prior to 2022, neither USDA nor New York State allowed for any replacement of skimmed SNAP benefits. In that year, a process for replacement of skimmed SNAP benefits was implemented but was very limited in scope. The amount that could be replaced was limited to "the amount of benefits stolen from the household" or "2 months of the [household's] monthly [SNAP] allotment[,]" whichever was the lesser amount. The frequency with which a claim could be submitted was limited to twice per federal fiscal year per household, and replacement was restricted to thefts that occurred between October 1, 2022, and December 20, 2024. 7 U.S.C. §

[3] *SNAP Replacement of Stolen Benefits Dashboard*, USDA-FNS, https://www.fns.usda.gov/data-research/data-visualization/snap-replacement-stolen-benefits-dashboard (last accessed June 10, 2025).

[4] *Id.*

2016a(b)(2). Defendant Guinn, while Acting Commissioner of OTDA, further required that claims be submitted within thirty days of discovering the theft to be considered timely. *See* Administrative Directive Memorandum from Barbara C. Guinn, Acting Comm'r, OTDA, "Replacement Procedure for SNAP and/or TA Benefits Stolen via Skimming, Cloning, Phishing or Other Fraudulent Methods" (Aug. 17, 2023), https://otda.ny.gov/policy/directives/2023/ADM/23-ADM-07.pdf (last accessed June 10, 2025); General Information System Message from Valerie Figueroa, Deputy Comm'r Emp. and Income Support Programs, OTDA, "Extended Federal Authority to Issue SNAP Replacement Benefits, and updates to Temporary Assistance (TA) Replacement Benefits, for Benefits Stolen via Electronic Means Such as Skimming, Cloning, Phishing or Other Fraudulent Methods" (Sept. 27, 2024), https://otda.ny.gov/policy/gis/2024/24DC064.pdf (last accessed June 10, 2025).

42. As a response to the skimming crisis affecting New Yorkers, OTDA rolled out a "freeze" feature available through the ebtEDGE website in or around August 2024. *See, e.g.*, https://otda.ny.gov/workingfamilies/EBT-scam-alert.asp (last accessed June 10, 2025). The "freeze card" feature allows a SNAP recipient to lock their EBT card to prevent it from being used until the account holder unlocks, or "unfreezes," it. To freeze cards, participants must create an account on ebtEDGE and then follow a multi-step procedure to lock the card from any use. Participants must then follow the same procedure to unlock or unfreeze the card. OTDA has promoted this freeze feature throughout New York State since it became available, including by publishing the form highlighted below (Pub-5261, available at https://otda.ny.gov/policy/gis/2024/24DC075-Attachment-1.pdf, last accessed June 10, 2025):



## Safeguard Your Card
### New EBT Freeze Card Feature is Available

Use the new freeze card feature to help secure your Electronic Benefit Transfer (EBT) card and protect your benefits from scam-related theft. You can freeze your EBT card when it is not in use and then unfreeze the card to make a purchase. Freezing your card is easy. Follow these four simple steps:

1. Download or open the **ebtEDGE** app on your mobile device or go to the cardholder portal on **ebtEDGE.com**.
2. Securely log in to your account and tap "**Freeze Card**" under "**Account Services**."
3. Select "**Freeze Card**."
4. A Freeze Card confirmation message will appear. Select "**OK**" to confirm.



Freezing your EBT card will block all purchases, balance inquiries, and transactions. Whenever you go shopping, use the ebtEDGE app to unfreeze your card and freeze it again after you check out. You can also use the ebtEDGE app, or go to **ebtEDGE.com**, to block online or out-of-state transactions.

**For more ways to protect your benefits, visit: otda.ny.gov/ebtscam**

NEW YORK STATE OF OPPORTUNITY | Office of Temporary and Disability Assistance

Pub-5261 • REV (08/24)

43. The freeze feature does not completely stop skimming or EBT theft. The feature is difficult or impossible to use for SNAP recipients who do not have ready access to the internet, who have limited literacy, or who do not read English or one of the other languages available on the ebtEDGE website.[5] Further, it is impractical to freeze and unfreeze and freeze again an EBT card every time a cardholder needs to use it—and it may be impossible to do so without a smart phone, sufficient minutes of phone service, or internet access. Finally, the freeze feature does not prevent

[5] ebtEDGE is available in Arabic, Chinese, English, Haitian Kreyòl, Polish, Russian, and Spanish.

the actual skimming of information from the card; at best, it makes it more difficult for thieves to use stolen data to steal benefits after the skimming has occurred. *See* OTDA GIS #24-DC-075 ("Update on Common Benefit Identification Card (CBIC) Freeze Feature") (Nov. 1, 2024), at p. 2 ("The freeze feature cannot prevent card information from being skimmed if a household's card is used on a compromised device."), available at https://otda.ny.gov/policy/gis/2024/24DC075.pdf (last accessed June 10, 2025).

**The Availability of Superior Chip Technology**

44. Chip cards used with chip readers are less vulnerable to skimming. As discussed *infra*, ¶ 51, New York State has not made any concrete efforts to implement chip cards in its SNAP program, despite the availability of federal guidance and support to do so. OTDA's choice to delay leaves millions of New Yorkers vulnerable to skimming.

45. In August 2024, technical standards for chip implementation in EBT were published by the American National Standards Institute. Financial Transaction Messages – Electronic Benefits Transfer (EBT) - Supplemental Nutrition Assistance Program (SNAP) and Cash Benefit Programs, Am. Nat'l Standard for Fin. Serv., https://webstore.ansi.org/standards/ascx9/ansix9582024 (last accessed June 10, 2025). The standards provide "technical specifications for exchanging financial transaction messages between an Acquirer and an EBT card issuer processor." *Id.* Following publication of the guidelines, the Secretary of Agriculture (hereinafter "the Secretary") wrote a letter to all state governors that read in part:

> SNAP cardholders can and should be afforded the same preventative protections that other cardholders are afforded under credit and debit industry standards. The industry shift toward chip cards has proven an effective method to safeguard card usage from theft and fraud. Therefore, the U.S. Department of Agriculture (USDA) strongly urges all States to adopt the new EBT standards, and to work with your EBT processor and SNAP retailers in your State to transition to SNAP chip cards as soon as feasible.

Letter to Governors – SNAP EBT Chip Cards, Food and Nutrition Service (Nov. 18, 2024), https://www.fns.usda.gov/snap/ebt/modernization/letter-chip-cards (last accessed June 10, 2025).

46. In addition to urging states to switch to chip cards, USDA has offered resources and technical assistance. The letter to governors notes that USDA will reimburse 50% of the administrative costs accruing from the switch to chip cards. Id. A similar letter to commissioners of all state SNAP programs offered technical assistance and linked to resources for implementing agencies. Letter to Commissioners – SNAP EBT Chip Cards, Food and Nutrition Service, (Feb. 6, 2025), https://www.fns.usda.gov/snap/ebt/modernization/commissionerletter-chipcards (last accessed June 10, 2025). USDA has also provided technical information and resources for EBT retailers. SNAP EBT Chip Card Technical Resources, Food and Nutrition Services (Jan. 6, 2025), https://www.fns.usda.gov/snap/ebt/modernization/chip-resources (last accessed June 10, 2025); SNAP EBT Chip and Tap Cards are Coming Soon, Food and Nutrition Service (Feb. 18, 2025), https://www.fns.usda.gov/snap/ebt/modernization/retailer-notice/chip-tap-cards (last accessed June 10, 2025).

47. New York's failure to implement chip technology is clearly a choice, particularly given that other states have taken action. California and Oklahoma are the current leaders in EBT modernization. *See* Attention: California and Oklahoma SNAP EBT Retailers, Food and Nutrition Service (Feb. 4, 2025), https://www.fns.usda.gov/snap/ebt/modernization/retailer-notice/chip-card-CAOK (last accessed June 10, 2025).

48. California was the first state to implement chipped cards. In late December 2024, it completed the first phase of implementation by issuing a total of 1,000 cards to beneficiaries in Los Angeles and Yolo Counties. The second phase, during which California will issue the

remaining estimated 3.4 million cards in weekly intervals, began in late February 2025 and was expected to last four months.

49. Oklahoma began its rollout of EBT chip cards in May 2025.

50. USDA has recently reported that Maryland, New Jersey, and Alabama are also expected to implement chip technology soon. *See* SNAP EBT Modernization, Food and Nutrition Service (May 2, 2025), https://www.fns.usda.gov/snap/ebt/modernization (last accessed June 12, 2025).

51. In contrast, New York has not taken any concrete steps to implement chip technology. In a public statement in July 2024 in response to a media inquiry, OTDA claimed that it was in the "early stages" of chip implementation. Food Stamps, Cash Assistance Debit Cards to Get More Secure in NY after 7 On Your Side Investigation, Eyewitness News 7 (July 9, 2024), https://abc7ny.com/post/food-stamps-cash-assistance-debit-cards-get-more/15045563/ (last accessed June 12, 2025). OTDA has taken no public actions and has made no public statements about chip implementation since then. (last accessed June 10, 2025). OTDA has taken no public actions and has made no public statements about chip implementation since then.

## PLAINTIFF FACTS

### Anna Gelman

52. Anna Gelman is a 90-year-old resident of Brooklyn who lives alone and relies on her $292 monthly SNAP benefit to buy food. Her only other income consists of Social Security Retirement (SSR) and New York State Supplemental Program (SSP) benefits in the total amount of $1,075 per month. She receives no other financial support, and she has no regular and ongoing savings because of her minimal income.

53. Ms. Gelman is limited in her mobility. She has a pacemaker due to heart arrhythmias. She also has severe arthritis. As a result of her limited mobility, she shops at the same two food markets down the street, within 500-600 feet of her home. The first store is NetCost Market, which is located at 3100 Ocean Avenue, Brooklyn. The second store is Mimino, located at 2969 Ocean Avenue, Brooklyn. Ms. Gelman's home care attendant always goes with her when she goes to the store, and Ms. Gelman typically spends between $5-$50 per trip when she goes food shopping.

54. In late December 2024, Ms. Gelman went food shopping. She tried to pay for her food using her EBT card, but the card was declined due to insufficient funds in the account. With assistance, she was able to access ebtEDGE, and she learned that on December 18, 2024, $318.83 had been stolen from her account and used to purchase goods at a store in Chicago, Illinois. As a result of the loss of food stamp benefits, Ms. Gelman had to use the remaining funds from her SSR to purchase food for the rest of the month. Because she had very limited remaining funds, Ms. Gelman purchased less food for herself than she normally does and was not able to celebrate Hanukkah in a meaningful way.

55. A community-based organization assisted Ms. Gelman in applying for replacement benefits for the stolen food stamps, but the application was denied for an alleged technical reason. As a result, Ms. Gelman was forced to reapply for replacement of the benefits and was not reimbursed until March 2025. Ms. Gelman received notice in late March 2025 that DSS had approved her application and reimbursed $318.83 into her account. However, when Ms. Gelman went shopping on April 2, 2025, she attempted to purchase less than $50 worth of food, and her EBT card was declined due to insufficient funds in the account.

56. With assistance, Ms. Gelman was able to access ebtEDGE, and she learned that DSS had deposited the $318.83 into her account on March 28, 2025, giving her a total balance of $409.05. The very next day, on March 29, 2025, the entire balance was stolen from her account and used to purchase goods at 2059 Frederick Douglass Boulevard in Manhattan, New York. As a result of this second theft, Ms. Gelman had to use funds from her SSR and SSP benefits after she paid her rent to purchase food for almost the entire month.

57. As a result of being forced to use her remaining SSR/SSP funds to purchase food, Ms. Gelman again purchased less food for herself than she normally does. She was also not able to properly celebrate Passover because she could not afford to buy kosher Passover food, and all she had was a box of matzo that someone had given her.

58. Ms. Gelman's ninetieth birthday was on April 10, 2025. Ms. Gelman had not purchased any new clothing for herself in over fifteen years, and so she had planned to buy a new outfit as a birthday gift to herself. However, when her food stamps were stolen and she had to use the funds from her SSR/SSP to purchase food, she was unable to buy any clothing for herself for her birthday.

**Yiraldy Rodriguez**

59. Yiraldy Rodriguez lives in the Bronx, New York, with her two daughters. Her family receives SNAP benefits of $768 each month. In addition to SNAP benefits, the family receives Safety Net Assistance (SNA) of about $350 per month.[6] Ms. Rodriguez relies on SNAP and SNA to make all of the food purchases for her family.

---

[6] New York State residents with low incomes may qualify for either of two types of cash public assistance: Safety Net Assistance (18 NYCRR 370) or Family Assistance (18 NYCRR 369).

60. In September 2023, Ms. Rodriguez went food shopping. She believed she had about $848 in SNAP benefits available through her EBT card. She discovered that both her SNAP and her SNA benefits had been skimmed when she checked her account balance and found that she had $0 instead. She felt awful as she was unable to purchase any groceries.

61. Ms. Rodriguez submitted claims forms to replace both the skimmed SNAP and SNA benefits. It took between one and two months for the benefits to be replaced.

62. Ms. Rodriguez and her family were unable to eat the foods they usually eat that month, including vegetables, fruits, and fish. She could not afford snacks for the children. They had to eat what few groceries they could afford, such as eggs instead of meat-based protein, and rationed their food, eating less protein than usual. She borrowed funds and groceries from her mother to help feed her children.

63. Ms. Rodriguez's benefits were eventually replaced. Ms. Rodriguez continues to rely on SNAP and SNA benefits for her family's food needs and is anxious that she will lose benefits again to skimming thieves. If she is skimmed again, she will not be able to have any of her lost SNAP benefits replaced.

**<u>Carl Adams</u>**

64. Carl Adams lives in the Bronx, New York. He receives the maximum monthly SNAP benefit of $292 per month. In addition to SNAP benefits, Mr. Adams receives about $637 per month in Social Security Survivor's Benefits and about $230 per month in Supplemental Security Income (SSI). He relies on SNAP benefits to make his food purchases.

65. On April 4, 2025, Mr. Adams went to the Foodtown supermarket at 1000 Allerton Avenue in the Bronx, NY. He made a food purchase totaling $1.98. The next day, he went to Costco to purchase the rest of his groceries for that month, particularly fruits and vegetables. He thought

he had the remainder of his monthly SNAP benefit, $290.02, available through his EBT card. However, when he tried to purchase groceries, he found that he had $0 instead.

66. Mr. Adams called the number on the back of his EBT card to inquire about the apparent loss of funds. The representative confirmed that his benefits had been stolen and used to purchase groceries at a supermarket in Chicago.

67. Mr. Adams felt disappointed and heartbroken. At the checkout counter, he felt that the store employees, who did not understand that his benefits were stolen, were suspicious that he had no funds to pay for his groceries and thought that he intended to steal.

68. Mr. Adams could not purchase any groceries that day. He was forced to put all of his grocery items back.

69. Mr. Adams called his local police department to report the theft. He was told that he should have registered an ebtEDGE account to protect against theft. Mr. Adams was not aware of ebtEDGE prior to this conversation. He also called his local political representatives to report the issue of EBT skimming but was told that at this point nothing beyond locking his account using ebtEDGE can be done to protect against theft.

70. Mr. Adams sought replacement benefits but was ineligible because the theft occurred after December 20, 2024.

71. To feed himself that month, Mr. Adams went to a local food pantry, where he obtained a small amount of groceries. He also borrowed $100 from his nephew. Additionally, he delayed paying his ConEd bill and paying for laundry that month.

72. Mr. Adams has multiple health conditions including high blood pressure, severe arthritis, an enlarged prostate, and colon polyps, the latter of which could develop into colon

cancer. His doctor advised him that to manage these health conditions and prevent the development of cancer, he should eat a very strict diet rich in fruits and vegetables.

73. Mr. Adams could not purchase as many fruits and vegetables as he normally would have in the month of April. For example, Mr. Adams normally buys four fresh pineapples in one month, but that month, he could not afford any. Instead, had to eat rice and canned fruits to make his groceries last.

74. Mr. Adams also has several food allergies, including shellfish, nuts, and wheat. Because of these allergies, he must purchase specific groceries that tend to be more expensive. As a consequence, he could not purchase many of his usual groceries, such as a loaf of wheat-free bread, during the month of April.

75. Although Mr. Adams received a replacement EBT card on April 12, 2025, he fears that his benefits may be stolen again, as there is no chip technology preventing skimming from happening again.

**<u>Michael Valdes</u>**

76. Michael Valdes lives in the Bronx, New York, with his partner. Mr. Valdes receives SNAP benefits of about $140 per month. In addition to SNAP benefits, the household receives SSR benefits of about $1,600 per month. Mr. Valdes relies on SNAP to make food purchases for his household.

77. In December of 2024, Mr. Valdes went food shopping. He believed he had about $140 in SNAP benefits available through his EBT card. However, when he tried to purchase his groceries, he found that he had $0 instead. He was unable to purchase any of the groceries he was expecting to purchase. Mr. Valdes felt embarrassed as he had no choice but to leave all groceries at the counter.

78. Mr. Valdes reported his card stolen and inquired about replacement benefits but found the process difficult to navigate as he does not have a home computer. Mr. Valdes eventually submitted a request for replacement benefits on April 25, 2025, and received replacement benefits on May 9, 2025.

79. Mr. Valdes had no choice but to rely on his SSR benefits and modest savings to purchase groceries that month. He had to rebudget funds that had been allocated to other expenses, including funds intended for his utility bill, rent, and copayments for doctors. It took him about six weeks to catch up on his rent and utility bills. He was unable to purchase many of the fresh foods he would have normally purchased, such as fruits and vegetables. Instead, he purchased inexpensive ultraprocessed and high-sodium foods. Mr. Valdes has high blood pressure, and the stress of this experience exacerbated his condition.

80. Mr. Valdes continues to rely on SNAP benefits for his household's food needs and is anxious that he will lose his benefits again to skimming thieves. If he is skimmed again, his lost SNAP benefits will not be replaced.

**<u>Maria Ayala</u>**

81. Maria Ayala lives in the Bronx, New York, with her husband, daughter, and young grandson. Ms. Ayala and her family receive SNAP benefits of $596 each month. In addition to SNAP benefits, Ms. Ayala receives $455.50 per month in SSI and $23 of SSP. Ms. Ayala's husband receives $619.86 in Social Security Disability Insurance (SSDI) and $444.64 in SSI per month. Ms. Ayala relies on SNAP benefits to make food purchases for her family.

82. On May 7, 2024, Ms. Ayala and her husband went food shopping. Upon returning home and discovering they had forgotten some items, Ms. Ayala's husband went back out to make additional purchases. He believed $326.98 in SNAP benefits were available through the EBT card.

However, when he tried to purchase groceries, he found that the entire balance on the card had been skimmed, leaving $0. He was unable to purchase the remaining groceries he had been expecting to purchase.

83. After discovering the theft, Ms. Ayala's husband spoke to the manager of the supermarket, who said nothing could be done. Upon hearing about the theft from her husband, Ms. Ayala felt worried and stressed about how she would afford groceries that month.

84. At this time, Ms. Ayala was recovering from a heart attack and had just been released from a weeklong hospital stay. Although her physician ordered her to rest, she had no choice but to visit DSS's Crotona Benefits Access Center on May 8, 2024, where she submitted a claim for replacement benefits. She followed up about one month later and was told by a center worker to submit another claim form. She followed this instruction.

85. When Ms. Ayala followed up at Crotona about the second claim, she was told she needed to file the claim again but this time at the Hunts Point Benefits Access Center—which is about a forty-five-minute bus ride from her home. She filed a third claim on or about July 18, 2024. She followed up again at the Hunts Point Center on September 26, 2024, and was told to submit yet another claim, but she could not because the center had no internet at the time.

86. Ms. Ayala's physician's orders required her to adhere to a strict diet following her heart attack, including fruits, vegetables, and fish. Because she was not able to complete her grocery shopping that month, she could not adhere to this medically necessary diet, and ate what she could afford, such as white rice and fried eggs. Her family lived off the few groceries they had been able to purchase and borrowed funds from a friend. Because the household is on a fixed income, it took two months to pay back the funds they borrowed.

87. After requesting a Fair Hearing, Ms. Ayala was issued full replacement benefits in April of 2025, eleven months after her initial claim was submitted. Ms. Ayala continues to rely on SNAP benefits for her family's food needs. She continues to worry about skimming. If her card is skimmed again in the future, the benefits will not be replaced.

**Boris Shulkin**

88. Boris Shulkin is a 79-year-old resident of Brooklyn. Mr. Shulkin lives with his spouse, Nina Shulkin, who is also 79 years old. The only income the Shulkins receive is $1,554 per month in SSI, and so they rely on their $492 monthly SNAP benefit to buy food. They receive no other financial assistance, and they have no regular and ongoing savings because of their minimal income.

89. The Shulkins live in the Brighton Beach area of Brooklyn and do all their food shopping at local supermarkets and grocery stores within walking distance of their home. Most of their transactions are very small; they typically spend $15-$30 when they grocery shop.

90. On March 11, 2025, the Shulkins tried to make a purchase of $7.99 at Gold Label, a grocery store located at 281 Brighton Beach Avenue near their home, and their EBT card was declined for insufficient funds.

91. With assistance, they reviewed ebtEDGE and learned that on March 10, 2025, at 6:36 a.m., $559.25 had been stolen from their SNAP account. According to the transaction history, the funds were used at Lagrange Deli in Yonkers, New York, Super Price Chopper in Buffalo, New York, Cop N Go in the Bronx, New York, and Guercio & Son in Williamsburg, Brooklyn (which is in north Brooklyn, a little over an hour by public transportation from Brighton Beach).

92. With no remaining SNAP benefits, the Shulkins used the remaining money from their SSI to buy groceries for the balance of March 2025. When they had exhausted their SSI

benefits, they visited the food pantry at Shorefront Jewish Community Council (Shorefront JCC) for the rest of the month.

93. As a result of the loss of their food stamps, the Shulkins purchased less food for themselves, including, in particular, fewer eggs and vegetables. What they did purchase was the cheapest of what they could find, including cheaper milk than they usually purchase. Their nutrition changed even more after they started visiting the food pantry at Shorefront JCC as they ate mostly canned and frozen foods.

94. Because the benefits were stolen after December 20, 2024, the Shulkins were not entitled to replacement benefits, and so they had to suffer this loss of their SNAP benefits without compensation.

95. The Shulkins continue to rely on SNAP for their food purchases, and they are anxious and angry as a result of this experience. They are very concerned that their benefits will be stolen again and that any lost benefits will not be replaced.

**96.** The Shulkins now use ebtEDGE to lock their EBT card between uses. The process for using the account is inconvenient for the Shulkins (especially because they cannot access ebtEDGE on their own), but they use it to the best of their ability as it is the only means they have to try to protect themselves from future skimming thefts.

**Barbara S. Colton**

97. Barbara S. Colton is an 86-year-old resident of Manhattan. Ms. Colton lives alone and relies on her $292 per month SNAP benefit to buy food. Her other income consists of a pension of $428 per month, $1,164 in monthly SSR benefits, and occasional assistance from her synagogue and a cousin.

98. Ms. Colton is homebound. Her home health aides and son do her food shopping at nearby grocery stores. Most of the transactions are small, rarely exceeding $50.00.

99. Over time, Ms. Colton accrued a large balance of SNAP benefits due in part to a hospitalization during which she did not use her benefits. Her balance varied but was rarely less than $1,000.00.

100. In September of 2024, Ms. Colton's home health aide did some routine grocery shopping for her. When the aide returned, Ms. Colton examined the receipt, which listed the items purchased as well as her current SNAP balance. Ms. Colton was shocked to read that her SNAP balance was only $13.00.

101. Ms. Colton called the number on the back of her EBT card, and a representative informed her that someone had made an $1,100.00 purchase at a live-poultry store in the Bronx on or about September 10, 2024. Ms. Colton was in disbelief. The EBT representative offered to send her a transaction history so that she could verify her purchases.

102. When the transaction history arrived, Ms. Colton saw not only the fraudulent $1,100.00 transaction but also five earlier fraudulent purchases, each less than $30.00 and made at various stores in Manhattan, the Bronx, and Staten Island, from late August and early September 2024.

103. Ms. Colton's son submitted a claim for replacement of stolen benefits to DSS on her behalf.

104. While the claim was pending and before she received her SNAP benefits for October 2024, Ms. Colton used money from her other income to purchase food. As a result, she was short on funds for other necessary expenses. Ms. Colton had to miss several doctor's appointments because she did not have enough money for cab fare and cannot navigate public transportation due to her mobility impairments.

105. Due to the legal limitations on replacement benefits, Ms. Colton only received $582.00 in replacement benefits—less than half of what was stolen from her.

106. Ms. Colton continues to rely on SNAP for her food purchases and is anxious that she will lose benefits again to skimming thieves. She knows that it is possible for skimming to happen again. Anytime she needs groceries, she becomes anxious at the prospect of using her EBT card in case it is skimmed during the transaction. If she is skimmed again, her lost SNAP benefits will not be replaced.

**La Red de Pueblos Transnacionales**

107. La Red is a grassroots community-based organization of immigrants living in New York City, with its office located in the South Bronx. The members of La Red are primarily Mexican immigrants, most of whom have indigenous heritage or are from rural areas. Promoting, celebrating, and recognizing indigenous cultures and traditions is central to La Red's mission. It often organizes cultural events that highlight indigenous peoples. To further its mission and to ensure the communities it serves have access to life-sustaining benefits, La Red provides its members support in applying for and maintaining their public benefits. Doing so provides the community with greater stability but takes significant organizational resources, as many of the organization's clients speak an indigenous language as their first language. La Red is closely associated with the Colibrí Interpreters Collective, with which it contracts to interpret and translate for its benefits programs.

108. In 2023, La Red hired a social worker to expand access to public benefits, including SNAP, within its community.

109. Each month, the social worker at La Red works with 10 to 20 members on benefits issues. The social worker, in alignment with La Red's mission, wanted the primary focus of this

work to be on expanding access to public benefits, with an emphasis on direct application assistance and referrals for other services.

110. However, La Red's benefits-related work came to include a robust response to skimming of SNAP benefits rather than expanding and increasing access to benefits. Instead of helping members apply for new benefits, La Red began helping members deal with skimming. In June 2024, 7 La Red members sought help replacing their skimmed benefits. La Red continues to help members whose SNAP benefits have been skimmed, even though federal reimbursement for lost benefits has ended. The organization was helping approximately 2 members per month with this issue until a recent increase in skimming that has required them to help about 10 members per month.

111. Skimming is so widespread that at one point a La Red member who was leaving an appointment regarding skimmed SNAP benefits ran into another member on the street who had just had her SNAP benefits stolen.

112. SNAP skimming cases take staff at La Red more time to resolve than standard benefits cases. Whereas a normal benefits case takes about 30 minutes and generally requires limited follow-up, skimming cases take up to an hour and 15 minutes and consistently require more substantial follow-up. Even now when SNAP recipients are not eligible for benefits replacement, staff still take time to connect them to food pantries and other resources.

113. In cases prior to December 2024, when members were eligible to submit claims to have their skimmed benefits reissued, the additional time required was largely a result of the work required to: assist with the creation of and access to an ebtEDGE account for the member; obtain the official records of the transactions through ebtEDGE, which was required before an application for replacement benefits could be filed; and complete and submit the application itself. In addition, these cases required more substantial follow-up in order to ensure the claim was processed and the

skimmed benefits were reissued. Many of La Red's members speak an indigenous language as their primary language. Neither the applications nor ebtEDGE is available in any indigenous language. Appointments with members who speak indigenous languages often took up to twice as long as appointments with members who spoke a language spoken by the La Red staff member assisting them and which is used on the portal and on the necessary forms.

114. Since the SNAP replacement program ended in December 2024, La Red's strategy has shifted towards mitigating the likelihood of their members being skimmed in the first place and connecting those who are still being skimmed with resources to ensure they can continue to feed themselves and their families. This includes creating and accessing an ebtEDGE account for the member, training the member on how to use the portal to try to prevent future skimming, and connecting members to food pantries and other emergency resources.

115. Members who are skimmed, as well as those who have not yet fallen victim to skimming, may try to protect their benefits through ebtEDGE's "freeze" feature, discussed *supra*, ¶¶ 42–43. Because ebtEDGE is not available in any of the indigenous languages that are the primary language of many La Red members, La Red staff members must have time-consuming sessions with members just so they can freeze or unfreeze cards. Due to the consistent demand for help with skimming and the inordinate amount of staff resources required to address each claim or potential claim, La Red is considering developing a presentation on card freezing, which will require additional expenditures for translation costs as well as for staff time.

116. In addition to their direct work with members impacted by skimming, La Red staff now expend time and resources informing their general membership about skimming and how to prevent it. For example, La Red's recurring weekly meeting is normally dedicated to organizing cultural events or disseminating information about other benefits, programs, and eligibility in ways

accessible to rural and indigenous migrants. However, because of the skimming crisis, La Red has changed these meetings to include presentations on skimming and will continue to incorporate them in future meetings. Given the short duration of the meetings, even a quick presentation on skimming takes away valuable time for community organizing and group discussion. Presentations and informational materials about skimming also require services from Colibrí interpreters and translators, for which La Red pays. Skimming distracts from both La Red's central mission and the core objectives of its programs.

117. Aside from operational strain on La Red, skimming places a huge financial and emotional strain on the organization's members. Given the looming threat of their benefits being stolen, La Red members fear they will not be able to feed their families, and those who have been skimmed express feelings of shame and embarrassment that the thefts occurred. Many members carefully budget their monthly benefits but have had their plans completely upended when they were skimmed at the beginning of the month. Additionally, members who have been skimmed have had to spend time and money travelling to Brooklyn, where DSS's Common Benefit Identification Card (CBIC) EBT Services Office is located, to get new cards.

118. Since the end of April 2025, La Red's members have experienced skimming at an increased and alarming rate. In the last two months La Red's social worker has helped 20 members deal with the effects of skimming, and those members have told her about at least 10 more members who lost benefits. Members use ebtEDGE to freeze their cards, but many experience skimming as soon as they unfreeze the card to buy groceries. Community members and La Red have heard about lines forming outside the Hunts Point Benefits Access Center, as SNAP recipients become increasingly anxious about ongoing benefit theft. La Red members feel ignored and left behind as officials allow their SNAP benefits, which are the only benefits many receive, to be stolen.

119. La Red's staff are dedicating more and more resources to deal with the problem of skimming. Though skimmed benefits can no longer be replaced, staff must still take considerable time to help members deal with skimming. When a member is skimmed, La Red's social worker gives them food pantry information, helps them register for ebtEDGE, and helps them fill out forms to report stolen benefits in the hope that the state will allocate budget money to replace lost SNAP dollars in the future. EbtEDGE remains confusing for La Red members to use, so staff must spend time explaining it. If a member is only fluent in an indigenous language, staff must spend even more time helping the member navigate it. Meanwhile, La Red staff hold regular meetings to plan trainings on ebtEDGE and are considering organizing an all-day event at which La Red members could learn how to freeze their EBT cards. These efforts are taking up to 20% of the workday for La Red's only social worker and diverting her from work on evictions, applications for other benefits, and longer-term projects around domestic violence. Because of the impact skimming is having on their work, La Red staff are also considering a campaign—which would require even more staff time and resources—aimed at getting the state to implement chips in EBT cards.

120. The continued risk of skimming and accompanying uncertainty about when it will occur puts a burden on La Red's public benefits work and the lives of its members. As long as New York State leaves its EBT cards vulnerable to skimming, the problem will continue costing La Red time and money while distracting from its mission.

**<u>INCIDENTS OF SKIMMING SINCE THE COMPLAINT WAS FILED</u>**

121. Since the original complaint was filed on June 12, 2025, several of the Plaintiffs have been victims of additional instances of skimming.

122. Plaintiff Maria Ayala lost $595.38 on July 7, 2025, via six unauthorized transactions. Four of those transactions were in Queens and two were in Rochester.

123. Plaintiff Michael Valdes lost $123.00 (his full monthly SNAP allotment) in two transactions on February 12, 2026: one in Brooklyn and one in Brushton, New York.

124. Plaintiff Yiraldy Rodriguez lost $764.40 in SNAP benefits in April 2026 due to skimming. On or about April 3, 2026, Ms. Rodriguez discovered a successful skimming transaction in Texas that drew benefits from her account as well as two transactions that were unsuccessful due to insufficient funds.

125. As in earlier incidents of skimming suffered by the Plaintiffs, Ms. Ayala, Mr. Valdez, and Ms. Rodriguez, lost SNAP benefits when skimming thieves stole their EBT card credentials from the magnetic strips on their cards using skimming devices surreptitiously installed in card-reading devices at vendors where they had used their cards. When an EBT card is skimmed, all information encoded on it is copied onto a second card so that the thieves can spend the victim's benefits at another location. See United States Secret Service, "U.S. Secret Service New York Field Office Skimming Operation Nets 35 Illegal Devices, Saves $36.5 Million," June 6. 2026, https://www.secretservice.gov/newsroom/releases/2026/06/us-secret-service-new-york-field-office-skimming-operation-nets-35(last accessed September 2, 2026) ("Scammers use skimming technology to capture card information from EBT cards and encode that data onto another card with a magnetic strip").

## CLAIMS

### First Claim

126. Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

127. By failing to deliver SNAP benefits to the individual Plaintiffs by available, secure chip technology Defendant is failing to provide them with "timely, accurate, and fair service," as Defendant is required to do by 7 U.S.C. § 2020(e)(2)(B)(i), which is made enforceable by 42 U.S.C. § 1983.

**Second Claim**

128. Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

129. By failing to deliver SNAP benefits to the individual Plaintiffs by available, secure chip technology, Defendant is failing to furnish the SNAP benefits to all eligible households, as Defendant is required to do by 7 U.S.C. § 2014(a), which is made enforceable by 42 U.S.C. § 1983.

**Third Claim**

130. Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

131. By failing to "take into account evolving technology and comparable industry standards" regarding "privacy, ease of use and access to and service in retail food stores," Defendant violates Plaintiffs' rights under 7 U.S.C. § 2016(h)(2)(A), which is made enforceable by 42 U.S.C. § 1983.

**Fourth Claim**

132. Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

133. By failing to implement available implement "measures to protect against fraud and abuse[,]" Defendant violates Plaintiffs' rights under 7 U.S.C. § 2016(h)(2)(C)(i), which is made enforceable by 42 U.S.C. § 1983.

**Fifth Claim**

134. Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

135. By failing to update SNAP EBT cards with secure chip technology, Defendant has failed to provide "timely and accurate issuance of benefits to certified households" as required in 18 N.Y. Comp. Codes R. & Regs. § 387.2 (p), to Plaintiffs' detriment.

## REQUEST FOR RELIEF

WHEREFORE, plaintiffs respectfully request that the Court:

a. declare that Defendant is required by the SNAP Act and New York State social services regulations to adopt chip technology for EBT cards as soon as practicable;

b. issue an injunction commanding Defendant to convert EBT cards to chip technology as soon as practicable:

c. issue an injunction commanding Defendant to establish a process for replacing SNAP benefits that are lost to skimming until Defendant has adopted more-secure chips technology for EBT cards;

d. award Plaintiffs their costs and attorneys' fees pursuant to 42 U.S.C. § 1988; and,

e. grant such additional or further relief as the Court considers just and proper.

Dated: Bronx, New York
September 3, 2026

Respectfully submitted,

________________________

Christopher D. Lamb, Esq.
Rachel Granfield, Esq.
John Paul Newton, Esq.
Alison Roberts, Esq.
BRONX LEGAL SERVICES
349 E. 149th Street
Bronx, New York 10451
(718) 928-3723
clamb@lsnyc.org

Daniel Barkley
Sara Manaugh
BROOKLYN LEGAL SERVICES
105 Court Street
Brooklyn, New York 11201
(718) 237-5547
dbarkley@lsnyc.org

Attorneys for Plaintiffs